Page 1

1              UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF MINNESOTA
2
3    - - - - - - - - - - - - - - - X
     DIOCESE OF DULUTH,              :INDEX NO.
4                                    :0:17-cv-03254-DWF-LIB
                    Plaintiff,       :
5                                    :
                                     :
6           v.                       :
                                     :
7                                    :DEPOSITION OF:
     LIBERTY MUTUAL INSURANCE        :DENNIS CONNOLLY
8    COMPANY, a Massachusetts        :
     corporation; CATHOLIC MUTUAL    :
9    RELIEF SOCIETY OF AMERICA, a    :
     Nebraska Corporation,           :
10   FIREMAN'S FUND INSURANCE        :
     COMPANY, a California           :
11   corporation; CHURCH MUTUAL      :
     INSURANCE COMPANY, a            :
12   Wisconsin corporation and THE   :
     CONTINENTAL INSURANCE           :
13   COMPANY, an Illinois            :
     corporation,                    :
14                                   :
                    Defendants.      :
15   - - - - - - - - - - - - - - - X
16        Transcript of the stenographic notes of the
17   proceedings in the above-mentioned matter, as taken by
18   and before TONIANN ACQUARO, a professional court
19   reporter and notary public within and for the State of
20   New York, held at the offices of Mintz Levin Cohn Ferris
21   Giovsky & Popeo, 666 3rd Avenue, 16th Floor, New York,
22   on Thursday, March 15, 2018, commencing at 10:06 in the
23   morning.
24
25   Job No. 2643368

Page 2

```
 1    A P P E A R A N C E S:
 2     BLANK ROME
 3       Counsel for Plaintiffs
 4            The Chrysler Building
              405 Lexington Avenue
 5            New York, New York 10174
 6     BY:   JARED ZOLA, ESQ.
              (212) 885-5209
 7            jzola@blankrome.com
 8
 9     MINTZ LEVIN COHN FERRIS GLOVSKY AND POPEO, PC
10       Counsel for Defendant Liberty Mutual Insurance
11            One Financial Center
              Boston, Massachusetts 02111
12
       BY:   JARED ZOLA, ESQ.
13            (617) 348-1865
              nadams@mintz.com
14                  and
              Mathilda McGee-Tubb
15
16
       CNA Coverage Litigation Group
17
         Counsel for Defendants Fireman's Fund
18
              333 South Wabash Avenue
19            25th Floor
              Chicago, Illinois  60604
20
       BY:   JARED ZOLA, ESQ.
21            (312) 822-4571
              scott.turner@cna.com
22
23
       ALSO PRESENT:
24
              Gregory G. Dimling
25
```

Page 3

```
 1   I N D E X
 2    WITNESS                  EXAMINATION BY        PAGE
 3    DENNIS CONNOLLY          MS. ADAMS            5, 98
                               MR. TURNER           89
 4                             MR. ZOLA             100
 5
 6
     E X H I B I T S
 7
      DEFENDANT'S     DESCRIPTION                    PAGE
 8
      Exhibit 1       Liberty Mutual Insurance       5
 9                    Company's Amended Notice of
                      Deposition and Request to
10                    Produce Documents at
                      Deposition
11
      Exhibit 2       Diocese of Duluth Rule         5
12                    29(a)(c) Expert Disclosure
13    Exhibit 3       Answers and Counterclaim of    12
                      Liberty Mutual Insurance
14                    Company to the Second Amended
                      Complaint
15
      Exhibit 4       Invoice from Dennis Connolly   13
16                    dated February 11, 2018
17    Exhibit 5       Excerpt from policy Bates      90
                      stamped DD_INS_00234 to
18                    DD INS 00244
19         (Exhibits to be produced with transcript.)
20
21
     R E Q U E S T E D   I N F O R M A T I O N
22
      INFORMATION REQUESTED                          PAGE
23
      Mr. Connolly's expert report prepared in the   99
24    Utica Fireman's Fund matter
25
```

```
                                                    Page 4
 1    F E D E R A L     S T I P U L A T I O N S

 2

 3              It IS HEREBY STIPULATED AND AGREED by and

 4    among counsel for the respective parties hereto, that

 5    the filing, sealing, and certification of the within

 6    deposition be waived.

 7

 8              It IS FURTHER STIPULATED AND AGREED by and

 9    among counsel for the respective parties hereto that all

10    objections, except as to the form of the question, shall

11    be reserved to the time of the trial.

12

13              It IS FURTHER STIPULATED AND AGREED that the

14    within deposition may be sworn to and signed before any

15    officer authorized to administer an oath, with the same

16    force and effect as if signed to before the Court.

17

18

19

20

21

22

23

24

25
```

1       D E N N I S  R.  C O N N O L L Y, of 17 Philip

2            Drive, Princeton, New Jersey 08540, after

3            having been duly affirmed, was examined and

4            testified as follows:

5   EXAMINATION

6   BY MS. ADAMS:

7               (Defendant's Exhibit 1, Liberty Mutual

8               Insurance Company's Amended Notice of

9               Deposition and Request to Produce Documents

10              at Deposition, marked for identification.)

11              (Defendant's Exhibit 2, Diocese of Duluth

12              Rule 29(a)(c) Expert Disclosure, marked for

13              identification.)

14          Q.   Mr. Connolly, thank you for coming here

15   today.  So we are here for your deposition.  I know

16   you've done this before, but if you have any questions,

17   if you need to take a break for any reason, or if any

18   of my questions you don't understand, just let me know

19   and I will rephrase or repeat them.

20          A.   That's fine.

21          Q.   We have marked as the first deposition

22   exhibit the notice for today's deposition.  Are you

23   here testifying in response to that deposition notice?

24          A.   Yes.

25          Q.   We've marked as Exhibit No. 2, a document

```
                                              Page 6
 1    titled Diocese of Duluth Rule 29(a)(2) Expert
 2    Disclosure.  Take a look at that document, please.
 3           A.    Okay.
 4           Q.    Is that your report attached to that
 5    expert disclosure?
 6           A.    Yes, it is.
 7           Q.    With respect to your name, it's
 8    Dennis Connolly with an O at the end; is that correct?
 9           A.    Yes.
10           Q.    With respect to the expert disclosure,
11    your name is misspelled; is that correct?
12           A.    That's correct.
13           Q.    But this is indeed you and your report?
14           A.    It is.  And my name is correctly spelled
15    on my report.
16           Q.    And that is your signature?
17           A.    That is.  If you count that as a
18    signature.
19           Q.    How were you contacted in this matter?
20           A.    By phone call.
21           Q.    And who called you?
22           A.    To the best my recollection, Jared Zola.
23           Q.    When did that occur?
24           A.    I think it was January 7, but it was
25    January of this year.
```

Page 7

1          Q.    Had you previously worked with Mr. Zola?

2          A.    No.

3          Q.    Had you previously worked with

4    Mr. James Murray, his partner?

5          A.    Not that I know of.

6          Q.    When were you retained?

7          A.    Shortly after that first call.

8          Q.    What was the assignment that you were

9    given during that first call?

10         A.    I was assigned to respond to a claim by

11   Liberty Mutual that certain policies issued to the

12   Diocese of Duluth did not have aggregates -- excuse me,

13   with regard to the question of the existence of

14   aggregates for non-product liability cases.

15         Q.    What contacts other than the initial

16   contact with Jared did you have regarding this

17   engagement?

18         A.    Several phone calls and a meeting to

19   prepare the report and then subsequently a meeting to

20   prepare for this deposition.

21         Q.    Did you ever speak to anybody at the

22   Diocese of Duluth?

23         A.    I did not.

24         Q.    Other than counsel for the Diocese, did

25   you speak anyone regarding this matter or your report?

Page 8

1          A.    No.

2          Q.    Were you given any limitations on your

3    assignment?

4          A.    Well, I was supposed to respond to

5    Liberty Mutual's allegations.  But other than that, I

6    was not limited.

7          Q.    And you executed an engagement letter?

8          A.    Actually, I don't recall.  Sometimes I

9    do, sometimes I don't.

10         Q.    Do you agree with me that there is a

11   difference between a commercial general liability

12   policy and comprehensive general liability policy?

13         A.    There is some difference.

14         Q.    What is the significance of the use of

15   the term "comprehensive" versus "commercial"?

16         A.    Comprehensive general liability policies

17   include all liabilities except those which are

18   excluded.  It is an invention of the early 1940's.

19         Q.    Is it your opinion that comprehensive

20   liability policies are effectively all risk policies;

21   is that what you are saying?

22         A.    No.  What I am saying is the

23   comprehensive general liability insurance policy, which

24   was introduced in the 1940's was intended to reverse

25   the practice which existed before of what I call the

Page 9

1   cafeteria purchase of policies.  So the company has a

2   general liability policy including all liabilities

3   unless that were excluded.

4        Q.    And in 1986 that changed to a commercial

5   general liability policy; is that correct?

6        A.    I think so.

7        Q.    Do you agree with me that there is a

8   difference at least today, in today's market between

9   personal injury and bodily injury?

10        A.    Actually, some policies use personal

11   injury to include bodily injury.  So it's a -- personal

12   injury has become a broader definition to encompass

13   what was the traditional bodily injury, but also to

14   include various personal injury torts.

15        Q.    That would be under state coverage B of a

16   commercial general liability policy?

17        A.    Yeah.

18        Q.    Back in the 1960s and early 1970s, did

19   insurers use one term over the other?

20        A.    Probably some did, dependent on the

21   sophistication of the individual underwriter.

22        Q.    So there was no unified standard term as

23   to whether it would be bodily injury or personal injury

24   back at that time?

25                      MR. ZOLA:  Objection to form.

1           MS. ADAMS:  It was a terrible

2       question.

3       Q.    So back in the '60s and early '70s, would

4   you see carriers using one term as opposed to the

5   other?

6       A.    Yes, I think so.

7       Q.    Which one?

8       A.    Different carriers use different terms.

9       Q.    There was nothing standardized about it?

10          MR. ZOLA:  Objection.

11      A.    Well, I think it was standardized, but

12  that didn't mean that people didn't do something

13  outside of the standard.

14      Q.    Which term was standardized?

15      A.    I would think in the '60s to the best of

16  my recollection, we used, at Liberty Mutual we used

17  bodily injury rather than personal injury, bodily

18  included what would now be called personal injury.

19  Same thing when I was at Public Service.

20      Q.    Can you go to your report which has been

21  marked as Exhibit No. 2?

22      A.    I can.

23      Q.    And begin at the beginning.  So on Page 1

24  with respect to your introduction that first paragraph.

25      A.    Yes.

Page 11

1          Q.    This sets forth your assignment.

2          A.    Yes.

3          Q.    Is it accurate that you were asked to

4    examine or to provide an opinion regarding commercial

5    general liability policies or should that be

6    comprehensive general liability policies?

7          A.    It actually should be the policies which

8    were at issue between 1967 and 1973.

9          Q.    Because you would agree with me that

10   those were not commercial general liability policies?

11         A.    I would have to see them again to look at

12   them.

13         Q.    We can do that.  When you looked at the

14   policies, were they attached to anything or did

15   Mr. Zola give them to you?

16                    MR. ZOLA:  Objection.

17         A.    Mr. Zola gave them to me.

18         Q.    Were they attached to anything?

19         A.    I think they were in a binder.

20               Or it's possible -- I simply don't

21   recall, but they might have been attached to the

22   answer.

23         Q.    I am trying to give them to you in the

24   form you looked at them.

25         A.    Right.

Page 12

1            (Defendant's Exhibit 3, Answers and

2            Counterclaim of Liberty Mutual Insurance

3            Company to the Second Amended Complaint,

4            marked for identification.)

5       Q.    Have you seen what has been marked

6  as Exhibit No. 3 before?

7       A.    Yes.

8       Q.    Did you review this document in

9  connection with preparing your report?

10       A.    I did.

11       Q.    Were you provided with a set of the

12  policy information separate and apart from what has

13  been attached to Exhibit No. 3?

14       A.    I think so.  I'm not positive.  I just

15  don't remember.

16       Q.    Do you have a file with respect to this

17  matter?

18       A.    I do.

19       Q.    And the documents that you reviewed, are

20  they in that file?

21       A.    They are.

22       Q.    Did you bring that file with you today?

23       A.    I did not.

24            MS. ADAMS:  Jared, we asked

25        for all the documents upon which he

1          relied.  I am assuming everything

2          that is in his folder is what we

3          have been provided.

4               MR. ZOLA:  Yes.  There is

5          nothing that Mr. Connolly reviewed

6          that wasn't explicitly listed in the

7          report.

8      A.    There is no question?

9      Q.    The question that was before you was

10   whether or not they were comprehensive general

11   liability policies.

12      A.    That's what I said before, comprehensive

13   general liability policies, commonly known as CGL.

14      Q.    In the next paragraph of your report you

15   talk about expertise in liability insurance and

16   insurance underwriting.  What is your experience with

17   respect to underwriting comprehensive general liability

18   policies?

19      A.    Well -- this is going to be a long

20   answer -- when I was with Liberty Mutual I was in a

21   department called claims legal.  We were constantly

22   with underwriters and underwriters would come to us to

23   discuss how to underwrite.  When there were policies

24   changes issued by the insurance services office, one of

25   my functions would be to explain those changes to

Page 14

1    underwriters, in other words, how to apply the change

2    to an underwriter.

3              When I was at Public Service Mutual

4    Insurance Company, there were several major changes

5    during that time period in the comprehensive general

6    liability insurance policy.  And my job aside from the

7    litigation responsibilities was to explain how the

8    policies worked and how they would apply with regard to

9    underwriting.

10             Q.   Was any of this experience prior to 1971?

11             A.   Yeah.

12             Q.   So ISO came into being effectually on

13   December 10, of 1970; is that correct?

14             A.   Yes.  When I say -- hereafter when I

15   refer to ISO, for example, when we talked before about

16   the creation of the CGL, that was in creation of the

17   combined joint effort of the two major rating bureaus

18   at that time.  And I think in 1966 they merged into

19   ISO.

20             Q.   So it's your understanding that two

21   rating bureaus merged in 1966 to create ISO?

22             A.   Yes.

23             Q.   With respect to the next paragraph in

24   your report.  These are the policy --

25             A.   Wait, the last question you asked me was

1     what was my experience in underwriting?

2          Q.    As an underwriter, prior to 1971.

3          A.    In part, in addition, I wrote a paper on

4     product liability underwriting, which is actually

5     general underwriting, though I wrote that paper in

6     1977, I also spoke to and dealt with underwriters who

7     were active in the '60s and '50s even.

8          Q.    Were you an underwriter yourself?

9          A.    At that time?

10         Q.    Prior to 1971?

11         A.    It depends on what you mean by an

12    underwriter.  I worked with underwriters.  I helped in

13    underwriter.  I think that is underwriting.  So I was

14    doing underwriter.  Did I have a card that said

15    underwriter?  No.

16         Q.    You were not an underwriter for an

17    insurance company?

18         A.    I did not have a title underwriter.  I

19    was working on underwriting, which I considered to be

20    underwriting.

21         Q.    In the next paragraph there is a

22    reference to the three historical and then you write

23    commercial, but that should be presumably comprehensive

24    general liability policies that are attached to Exhibit

25    No. 3; is that correct?  Those are the documents you

1   are referring to?

2           A.    Yes.

3           Q.    It says you personally reviewed those

4   documents.  Did anyone else review documents on your

5   behalf?

6           A.    No.

7           Q.    No one else assisted you in the

8   preparation of your report other than counsel?

9           A.    That's correct.

10          Q.    And then you also analyzed quote, certain

11  other insurance policy information, close quote,

12  relating to CNA?

13          A.    Well, I analyzed the CNA policy.

14          Q.    Did that have any bearing upon your

15  opinion with respect to the Agricultural policies?

16          A.    Yes.

17          Q.    In what way?

18          A.    It's what we call a bookend, that is to

19  say it showed the kind coverage, so that you had a

20  picture of the kind of coverage that existed in 1964

21  through the inception of the CNA policy or Fireman's

22  Fund policy in I think it was February of 1973.

23          Q.    And that concept is referenced in your

24  report?

25          A.    Yes, it is.

Page 17

1      Q.    We will get to that later.

2            Who selected the documents that you were

3   going to review in preparing your report?

4      A.    I don't recall.  I would have asked

5   for -- I was given the opportunity to have anything I

6   wanted, but for the purpose of this report it appeared

7   to me that the policies themselves plus the complaint

8   and the answer were sufficient to cover the issues.

9      Q.    Did you analyze the policies that were in

10  place prior to the Agricultural policies?

11     A.    I did not.  I have in the past analyzed

12  policies issued to other dioceses prior to 1964.  So I

13  have a general familiarity with what some other

14  dioceses policies --

15     Q.    But my question is whether or not you

16  analyzed the policies that were issued to the Diocese

17  of Duluth prior to 1964?

18     A.    And I answered no, but.

19     Q.    I appreciate the "but," but the answer is

20  no.

21           With respect to the issue of preliminary

22  primer, you agree with me that insurance is a risk

23  management tool?

24     A.    Hey, it's got a lot of functions.

25     Q.    It is a risk management tool?

Page 18

1          A.    It is a risk management tool.  It is a

2     risk spreading tool.  It's a risk sharing tool.

3          Q.    And then you move into a discussion with

4     respect to automobile liability insurance and how it

5     works.

6          A.    Right.

7          Q.    You agree with me that that's not

8     relevant to your opinion here?

9                     MR. ZOLA:  Objection to form.

10         A.    No, I don't agree.  I think that in order

11    to explain to the trier of facts how insurance works,

12    because I noted that most people don't understand and

13    have no reason to know how insurance works in the

14    commercial context, so it's important to distinguish

15    between the kind of insurance that many people are

16    somewhat familiar with, auto or homeowners versus

17    commercial.

18         Q.    Have you analyzed the claims that have

19    been made against the Diocese of Deluth?

20         A.    No, I've analyzed other archdiocese

21    claims.

22         Q.    But you have not analyzed the ones

23    against the Diocese of Duluth?

24         A.    That's correct.

25         Q.    And they are not automobile claims; do

Page 19

1    you agree with that?

2         A.    I do, absolutely.  Maybe there is an

3    automotive claim that is not a relevant matter.

4         Q.    With respect to insurance being a risk

5    spreading device, how is that relevant to your opinion

6    in this matter?

7         A.    Well, it explains the operations of

8    insurance.  How insurance works, how underwriters work.

9    It is -- sometimes people think it is risk bearing, but

10   when the insurance industry is functioning properly,

11   it's risk spreading.  So if you take -- you know you

12   are going to have some losses and you hope you don't

13   have too many, but you spread that risk.  Just like in

14   auto, not everyone has an accident, but everybody is

15   paying a portion, part of which pays for that accident.

16        Q.    So if a company is making a profit, they

17   are presumably doing a good job at risk spreading?

18                    MR. ZOLA:  Objection.

19        A.    Well, it depends on what you mean by

20   profit.  The idea -- the fundamental idea in the

21   insurance industry is to operate with an underwriting

22   gain.  But profit is also built in so that the

23   insurance industry builds into its rates a profit

24   margin, particularly at this time.  And then, in

25   addition, the insurance industry can make -- as I

1    pointed out -- money in other ways, which would be

2    profitable including investment income, for example.

3         Q.   So you don't understand the concept

4    underwriting profit?

5         A.   I do.

6         Q.   So my question to you was:  If a company

7    is making an underwriting profit, then are they are

8    spreading their risk?  Are they using the risk

9    spreading device you are talking about in Paragraph 3?

10        A.   If they made an underwriting profit, then

11   their underwriting-loss ratio would be positive and

12   they would be successful in spreading risk.  So that

13   they would pay the insureds and bill the insureds and

14   they would spread it out.

15        Q.   And if they had a loss --

16        A.   Underwriting loss.

17        Q.   Correct.  Then they may not be doing such

18   a great job at spreading risk?

19        A.   That's true.  They may do other things to

20   try to improve.  For example, when I was at

21   Liberty Mutual one year we had a -- I noticed on the

22   claims files all of them stamped with minus 3 percent.

23   And the idea there was that the insurers, the claims

24   people were supposed to pay less than 3 percent of what

25   they had previously been paying on claims.  That is a

Page 21

1  way of increasing underwriting profit.

2          Q.    With respect to risk sharing devices, you

3  are considering quota arrangements; is that what you

4  are talking about?

5          A.    No.  I am talking about the general

6  operation in the insurance industry.

7          Q.    Did Agricultural --

8          A.    There also would be quota share of

9  particular policies.  But that's -- in here that's not

10  what I'm talking about.

11          Q.    The Agricultural policies do not fall

12  into the risk sharing category; is that correct?

13          A.    No.  All insurance policies fall into

14  risk sharing.  In other words, Agricultural insured the

15  Diocese and I'm sure they insured lots of other things.

16  They are there to spread the risk amongst all of those.

17  And you are sharing risk.

18          Q.    So your report says that risk sharing is

19  when you have a group or pool of insurance companies

20  that combine to share the risk.

21          A.    That's a certain kind of risk.  Where is

22  that?

23          Q.    That would be the second sentence in

24  Paragraph 4.

25          A.    That references to a different kind of

Page 22

1    risk sharing.  That's where as you are probably

2    familiar you might have a high-access layer with a

3    quota share out of a $10 million layer.  There are two

4    insurers each taking 50 percent.

5           Q.    I think this is talking about a tower of

6    insurance.

7           A.    That's one kind.  There also are pools of

8    insurance, for example, the American Nuclear Insurance.

9    It's a pool.  There are also fair plan pools, assigned

10   risk pools.  But also in history, the whole operation

11   is dependent on risk share.

12          Q.    None of those devices are relevant to the

13   Agricultural policies; is that correct?

14          A.    They are relevant -- well, first off,

15   risk sharing is relevant in the insurance industry.

16   That's what I am talking about.

17          Q.    But you are not talking about anything

18   specific to the Agricultural policies.  That is all I

19   am trying to establish.

20          A.    Well...

21          Q.    I mean, you have spent pages talking

22   about the background as you see it with respect to

23   insurance.  But that does not bear directly upon your

24   opinion as to whether the Agricultural policies did or

25   did not have an aggregate limit for non-products bodily

Page 23

1     injury claims?

2                    MR. ZOLA:  Objection to form.

3          A.    I think that these are parts which help a

4     trier of fact understand how the insurance industry

5     operates.  I am not suggesting that Liberty Mutual or

6     Agricultural were a part of a pool or quota share.

7          Q.    You understand that Liberty Mutual did

8     not issue the Agricultural policies?

9          A.    That's correct.

10         Q.    You understand that Liberty Mutual had

11    nothing to do with the Agricultural policies?

12         A.    Well, I don't know that.  I know that the

13    policies that were issued were Agricultural.

14         Q.    Do you believe that Agricultural was a

15    subsidiary or somehow an affiliate of Liberty Mutual

16    between 1964 and 1973?

17         A.    No --

18                    MR. ZOLA:  Calls for a legal

19              conclusion.

20         A.    I don't know.  My understanding is that

21    Agricultural issued the policies.  I don't know if

22    there was a relationship at that time or whether a

23    relationship arose later on between Agricultural and

24    Liberty Mutual.

25         Q.    Did you do any analysis with respect to

Page 24

1    Agricultural Insurance Company?

2            A.    No.

3            Q.    Do you know where it's domiciled?

4            A.    I think I saw it on its policies, but,

5    no, I don't.

6            Q.    Do you know what, if any, rating bureau

7    it belonged to?

8            A.    No.  I noticed that I believe it was

9    using an ISO form, so I suppose it belonged to ISO.

10           Q.    That would be after December 10, of 1970.

11   Prior to December 10, of 1970, do you know what, if

12   any, rating bureau Agricultural Insurance Company

13   belonged to?

14           A.    I think it was using -- at that point, I

15   think it was still using the ISO CGL policy form.

16           Q.    So ISO doesn't come into existence until

17   December 10, of 1970.

18           A.    When I talk about ISO, rather than break

19   it into the ancient -- the ancient National Fire

20   Writers and the other rating bureau, I did not do that.

21   So I don't know which one they belonged to.  But they

22   were using a form that was a combined form of, as I

23   mentioned before, the two major rating bureaus.  There

24   is also a third rating bureau.

25           Q.    There are actually over 200 rating

Page 25

1    bureaus, right?

2          A.    Right.  The big ones were the -- the ones

3    that became ISO.

4          Q.    Which were the two rating bureaus that

5    you identified?

6          A.    Yes.

7          Q.    You can go to Paragraph 9 of your report.

8    And read the first sentence to yourself, please.

9                Have you spoken to anyone from the

10   Diocese of Duluth with respect to their insurance

11   program from 1964 to 1973?

12         A.    No.

13         Q.    Do you have any basis to make this

14   statement with respect to the Diocese of Duluth?

15         A.    That most businesses brought insurance?

16   Are you talking Paragraph 9?

17         Q.    Do you know whether the Diocese of Duluth

18   maintained the types of insurance coverage that you

19   have listed in the second sentence; property insurance,

20   employee dishonesty theft insurance, employer

21   liability, commercial general liability insurance, or

22   directors and officers insurance?

23                     MR. ZOLA:  Objection to form.

24         A.    Well, what we do know is they purchased

25   comprehensive general liability insurance.  Whether

Page 26

1    they would have the other types of insurance, property

2    insurance -- property insurance, for example, would be

3    first-party insurance and I don't know whether they did

4    or they didn't.

5         Q.    On Page 5 of your report, you begin a

6    discussion of a process in which insurance policies are

7    purchased; is that right?

8         A.    Correct.

9         Q.    And this is just one way that you set

10   forth in Paragraphs 10 through 13 in which insurance

11   can be purchased; is that correct?

12        A.    Well, I think I made it broad enough so

13   that it would encompasses different kinds of insurance

14   purchased.  Broadly speaking, insurance is purchased

15   either through directly as in a direct writer or

16   through an agency writer.

17        Q.    Do you know how the Agricultural

18   Insurance Company how they did their underwriting?

19        A.    I do not.  How they did their

20   underwriting?  No.

21        Q.    Do you know if the Diocese contacted an

22   insurance agent?

23        A.    I do not.

24        Q.    Do you know if the Diocese filled out an

25   insurance application?

1                MR. ZOLA:  Ever?

2       Q.   Between 1964 and 1973?

3       A.   I do not.

4       Q.   Have you ever seen an Agricultural

5  Insurance Company application from the 1960s or 1970s?

6       A.   Not that I recall.  But that does not

7  mean that I did not.

8       Q.   But you just can't remember.

9       A.   Correct.  I have seen thousands of

10  applications.

11                MR. ZOLA:  As we've noted in

12            e-mails, once Liberty Mutual

13            produces the documents, if there are

14            applications in there, we are going

15            to show them to our experts and the

16            bases for their opinions are going

17            to be updated and we are not

18            producing the witnesses for another

19            deposition after that.

20                MS. ADAMS:  And as we have

21            repeatedly informed the Diocese

22            there are no such documents.

23                MR. ZOLA:  So you are asking

24            the witness if he has seen documents

25            that don't exist?

Page 28

1              MS. ADAMS:  We do not have

2              possession, custody or control of

3              any such documents.

4              My question to the witness is

5              in Paragraph 11, he discusses

6              insurance applications.  And was

7              whether or not the Diocese had

8              filled out an insurance application.

9              The fact that Liberty Mutual does

10             not presently have a copy of it does

11             not mean that one did not exist at

12             some time.

13             MR. ZOLA:  Is that a

14             question?

15             MS. ADAMS:  It's a statement

16             to you.

17        Q.   Is it possible that with respect to the

18   Diocese of Duluth, that an Agricultural agent actually

19   issued the policy?

20        A.   Well, an agent would be acting for the

21   insurer if it issued the policy.

22        Q.   Right.  A field agent, an Agricultural

23   field agent could have issued --

24        A.   Right.  Or a general agent --

25        Q.   -- the policy?

Page 29

```
 1        A.    -- or something of that sort.  It's
 2   entirely possible.
 3              I would, just to go back to the
 4   application.  Applications were generally fairly
 5   similar and drafted usually by brokers and then used by
 6   applicants.
 7        Q.    When you use the term "broker," are you
 8   meaning a field agent or are you talking about
 9   something different?
10              MR. ZOLA:  Objection to form.
11        A.    I'm talking about a broker, but also I
12   broadened it -- good point -- I broadened it to a
13   producer.  A producer is a term that includes both
14   agents and brokers.
15        Q.    Do you know if the Diocese had a broker
16   between 1964 --
17        A.    I do not.
18        Q.    -- and 1973?
19              Other than the insurance policies that
20   you've examined attached to Exhibit No. 3, and the CNA
21   information, do you have any information regarding the
22   Diocese of Duluth's insurance program from 1964 to
23   1973?
24        A.    No.  Other than a general background with
25   regard to a diocese and the types of insurance they
```

1      would buy.

2           Q.    Are you familiar with the term "dailies"?

3           A.    Yes.

4           Q.    And once a field agent would issue a

5      policy, they would then send the dailies to the

6      carrier?

7           A.    The daily would be a confirmation, yeah.

8           Q.    In Paragraph 12, because you go through

9      the process of underwriting, you describe the point in

10     time in which an insurance binder is issued.

11          A.    Yes.

12          Q.    Have you seen a binder that was issued to

13     the Diocese of Duluth?

14          A.    I have not.

15          Q.    Do you know if at the time the insurance

16     policy was purchased the Diocese of Duluth, and this

17     would be between 1964 and 1973, whether or not or when,

18     I should say, the premium was paid?

19                     MR. ZOLA:  Objection to form.

20          A.    I think that one of the policies

21     required -- two of the policies I thought required

22     advanced payment of premium.  When we get to the

23     policies we can verify.

24          Q.    So that takes us to underwriting profits.

25     How insurance companies make money.  And we talked

1    about this a little bit before.  But can you describe

2    the relationship between operating ratios and profit?

3          A.    Operating ratios include a profit, but

4    they do not include investment income.  So you can have

5    a underwriting profit, that is to say you have written

6    insurance policies, generally speaking, at the time we

7    are talking about the expense ratio is created by the

8    rating bureau, so in between 23 to 35 percent.  So if

9    you wrote a dollar of premium and you paid out anything

10   other than -- taking 35 percent -- if you paid out 60

11   percent, then you hit a 5 percent underwriting profit.

12   But there is profit in an expense ratio so you'd have

13   double profit.  And then if you made money on investing

14   income, even more money.

15         Q.    Is that 5 percent?

16         A.    In the expense ratios.

17         Q.    Is that correct?

18         A.    To the best of my recollection, yes.

19         Q.    What if your expense ratio was 105

20   percent or your operating ratio -- strike that.

21               If your operating ratio was 105 percent?

22         A.    Then you would be -- assuming a 5 percent

23   profit in the expense ratio and assuming your expense

24   ratio was as the ISO or rating bureau filings went,

25   then you would be breaking even, but then you would

Page 32

1    have investment income in any case.

2         Q.    You are not doing so great at 105

3    percent?

4                        MR. ZOLA:  Objection.

5         A.    The object is not to do 105 percent.  But

6    as John Cox once said, he was the president of INA, he

7    said, I can have an 11 percent loss ratio and still

8    make money.  Of course that was during a period of

9    extreme inflation.

10        Q.    And if you are at 50 percent, then,

11   obviously, you are doing much better.

12                       MR. ZOLA:  Objection.

13        A.    The idea is to keep your loss ratio up.

14                       MR. ZOLA:  Belated objection

15               to form.  If you would just give me

16               one second to make an objection

17               before you answer, I would

18               appreciate it.  I wanted to make it

19               contemporaneous, but.

20        Q.    If you have a lower operating ratio, then

21   you might be able to, as an insurance company, do other

22   things with your capital, say put more in investment

23   income.  You might expand into other areas; is that

24   correct?

25                       MR. ZOLA:  Objection.

1      A.    If you were -- the idea is, in fact, to

2   do better with the expense ratio, because then you can

3   put the money into your surplus as well as other

4   things.  For example, The Hartford decided not to buy a

5   helicopter, Aetna did buy a helicopter.  So you can do

6   things with the surplus when it arises.  But if you can

7   build your policy over surplus, then you can build a

8   bigger insurer.

9      Q.    And if the opposite is the case, if you

10  have a very high operating ratio as an insurance

11  company, you might constrict someone on underwriting;

12  is that correct?

13     A.    Sure.  In 1984, the expense, the loss

14  ratio for the insurance industry was 132 percent.  And

15  in 1985, it was 150 percent.  That meant that the

16  policyholder surplus went down.  So the insurance

17  industry could not write as much insurance as they

18  wanted or as the public wanted, which is why there were

19  so many hearings on the availability of insurance.

20     Q.    And that led to a hardened market.

21     A.    Yeah, absolutely.

22     Q.    And it led to a narrowing of coverage; is

23  that right?

24     A.    That's correct.

25     Q.    In Paragraph 17, I just want to

Page 34

1   understand how this works.  Resisting claims is a way

2   to make money?

3        A.    Yes.

4        Q.    Or is it a way to reduce your exposure?

5        A.    It is a way to reduce exposure.  But it

6   is -- reducing exposure makes money.  If you don't pay

7   claims or you underpay claims, then you will reduce

8   your loss ratio.  That's why Liberty Mutual in 1970 or

9   somewhere before I left had that 3 percent reduction

10  request.  Sure.  I mean, it's quite simple.  You

11  tighten on paying claims or you delay paying claims.

12  If you delay paying claims, even if you've agreed on an

13  amount, but you hold it, you get investment income on

14  what you are holding.

15       Q.    Did Agricultural do any of that?

16       A.    I don't know.

17       Q.    In Paragraph 18 of your report, are you

18  describing today's market or are you describing the

19  market back in the '60s and early 1970s?

20       A.    I am describing the '60s and '70s.  And,

21  by the way, generally speaking, I think it's still

22  true.

23       Q.    So in Paragraph 20 --

24       A.    Having them back to back means I get to

25  the pages faster.

Page 35

1        Q.    -- there are two fundamental obligations

2   and it's effectively, what, the duty to defend and the

3   duty to indemnify?

4        A.    Yes.

5        Q.    And buried in the duty to defend or part

6   of the duty to defend is also supplementary payments,

7   correct?

8                    MR. ZOLA:  Objection --

9        A.    That's the way --

10                    MR. ZOLA:  -- to form.

11        A.    That is a way of paying defense costs.

12        Q.    So it's your opinion the defense costs

13   fall within supplementary payments?

14        A.    Yes.  Or they may exist independently.

15   Different policies do it in different ways.

16        Q.    Right.  And so in the second sentence

17   here you say, "First, subject to the terms and

18   conditions of the particular CGL policy..."

19               Presumably because all policies are

20   different; is that right?

21        A.    Well, all --

22                    MR. ZOLA:  Objection to form.

23        A.    Not all policies are different.  Most

24   policies follow a format.  Some policies are different.

25        Q.    So what do you mean by this, "Subject to

Page 36

1  the terms and conditions of the particular CGL policy"?

2  　　　　A.　　Well, what I mean by that is you have to

3  look at the policy, that although there are generalized

4  forms, an individual carrier might file their own

5  forms.  As we discussed before, some policies use

6  personal injury, some use just bodily injury.  So there

7  are different kinds of policies.  And sometimes there

8  are policies which are -- though they are rare, there

9  are some policies that are what we call manuscript.

10  　　　　Q.　　The one real limitation on a carrier's

11  ability to issue a policy with respect to terms and

12  conditions is approval by the regulators.  In other

13  words, if a regulator will approve a filing, then a

14  carrier can use it.

15  　　　　　　　　MR. ZOLA:  Objection.

16  　　　　A.　　Generally, although and, for example, in

17  New York, a regulator might slip up and allow a policy

18  to cover punitive damages.  The policy still would not

19  cover punitive damages because it's a state public

20  policy not to cover punitive damages.

21  　　　　Q.　　Right.  As a matter of law you can not

22  insure punitive's in New York.

23  　　　　A.　　Correct.

24  　　　　Q.　　But as long as back in the '60s and early

25  '70s the regulators were approving the forms.  The

Page 37

1    carriers could use the forms in that jurisdiction?

2         A.    That's correct.  Though, just to be

3    clear, the rating bureaus filed forms and then

4    individual companies might vary the form and file it

5    themselves.

6         Q.    The rating bureaus filed the forms on

7    behalf of the companies?

8         A.    That's correct.  But a company could file

9    its own form.

10        Q.    So it could do it either way?

11        A.    Or both.

12        Q.    Twenty-one.  With respect to the third

13   sentence here, I mean, are you suggesting that the

14   single coverage period is the result of lawsuits filed

15   against religious organizations?

16        A.    What I was suggesting is that sometimes

17   policies for certain kinds of exposures were written on

18   what was called a claims-made basis.  So that sometimes

19   you would have a single year.  On the other hand,

20   sometimes there were policies written on the current

21   basis so that you would have coverage over tens of

22   years.

23        Q.    I'm certainly familiar with claims

24   re-policies.  So respect to the little one you have,

25   the "provide coverage during a single coverage period,"

Page 38

1    you are referring to claims-made coverage?

2           A.    No.

3                       MR. ZOLA:  Objection to form.

4           A.    Actually, what I'm referring to there is

5    that during a single period you might buy policies in a

6    tower.

7           Q.    And then little two, you say,

8    "...cumulatively, provide tens, or even hundreds, of

9    millions of dollars..."

10                What do you mean by cumulatively?

11          A.    In other words, if you -- well, there we

12   would be talking about policies where there is a -- or

13   incidences in which there is a continuous injury.  In

14   that case, if you purchased 10 million in year one, 10

15   million in year two, 10 million in year three, you

16   could end up with $30 million worth of coverages

17   arising from the same event.

18          Q.    So certain environmental claims, for

19   example, might fall within that category?

20          A.    Yes.  And certain product liability

21   claims.

22          Q.    Bodily injury claims, do not fall within

23   that category?

24                       MR. ZOLA:  That calls for

25                legal conclusion.

Page 39

1          A.    That is not my understanding.  I believe

2    that asbestos claims, for example, capture years and

3    years and years of coverage and many drug claims do the

4    same.

5          Q.    How about -- going back to your example,

6    an automobile accident; is that cumulative?

7          A.    That is generally not.  But it could be.

8    You could have an accident one year causing injury

9    which arises in subsequent years.

10         Q.    And if that were to be the case, so if

11   you have an accident in year one and you broke your leg

12   and then year two and three the leg got worse leading

13   to another injury, it's your opinion that all three of

14   those policies would apply?

15         A.    No, that's not what I said.

16                    MR. ZOLA:  Objection to form

17               and calls for a legal conclusion.

18                    MS. ADAMS:  With respect to

19               the legal conclusion.  I just want

20               to be clear that he is testifying as

21               to the interpretation of policy,

22               which is a legal conclusion.

23                    THE WITNESS:  I am testifying

24               to the custom and practice.

25                    MS. ADAMS:  Yeah, actually

Page 40

1               not.

2       Q.    So the answer is no?

3       A.    With regard to the auto?

4               MR. ZOLA:  Wait.  Wait.

5           Wait.

6               Nancy, with respect to your

7           testimony, I fully disagree with

8           your characterization of what

9           Mr. Connolly is here to testifying

10          about.

11              And my objection to the legal

12          conclusion is that you are giving

13          him hypotheticals that I am not even

14          sure a seasoned coverage lawyer

15          could answer without knowing more,

16          such as which state are we talking

17          about.  In a vacuum, we are talking

18          about auto claims, whether they

19          trigger multiple periods?  What are

20          we talking about?  I objected.  I

21          let him answer.  He answered so we

22          can move on.

23      Q.    My question is simply whether or not the

24  use of the second section in here with respect to the

25  cumulatively providing tens or hundreds of million of

Page 41

1    dollars in insurance limits is applicable to the bodily

2    injury claims that have been asserted against the

3    Diocese.

4                        MR. ZOLA:  That wasn't the

5                    question you had.  If you want to

6                    ask that --

7          A.    Well, I think that is actually a legal

8    conclusion --

9          Q.    Then you don't have to answer it.

10                So moving on.  Paragraph 22, I think is

11   an example of what you are talking about on the

12   cumulative with respect to asbestos claims.

13                        MR. ZOLA:  Is that a

14                    question?

15                        MS. ADAMS:  Yes.

16                        MR. ZOLA:  Objection to form.

17         A.    Yes.  By the way, I don't rule out the

18   possibility that the bodily injury claims asserted in

19   the archdiocese-type claims might also be cumulative.

20   That is, I suppose, a question of law, but I can

21   conceive of that being a cumulative.

22         Q.    With respect to the second sentence

23   there, it starts with, "For example, in an individual

24   is diagnosed...," and you continue on with the various

25   policies that would apply, that is also a legal

Page 42

 1    conclusion depending upon what law applies?

 2         A.    Well, that's also true.  It's also a

 3    custom and practice.

 4              MS. ADAMS:  I think just

 5              before we move on we have been going

 6              for an hour.  I'd just like to take

 7              a short break.

 8         (Brief Recess.)

 9         Q.    So we are on Paragraph 23, beginning of

10    the section called "Aggregate Limits."  And in this

11    section you state that, "This is important to limit the

12    liability of an insurer in products liability where a

13    product with a defect may injure thousands of people."

14              Did I read that correctly?

15         A.    Correct.

16              MR. ZOLA:  Where are you?  I

17              am not objecting.  I just didn't see

18              it.

19              THE WITNESS:  She is on the

20              last sentence of 23.

21              MS. ADAMS:  Are you sure

22              you're not objecting?

23         Q.    You agree with me that it's also true

24    that it's important to have aggregate limits for bodily

25    injury claims?

Page 43

1          A.     Not necessarily.  It's not the same

2    thing, product liability.  Product liability has

3    historically had aggregate limits.

4          Q.     I appreciate that's your opinion.  My

5    question is:  Today are policies issued with the

6    aggregate limits on bodily injury non-products cases?

7          A.     Today?

8          Q.     Today.

9          A.     I don't know.

10         Q.     You don't know if --

11         A.     As of today, no, I don't.

12         Q.     Are you familiar with any of the policies

13   issued after 1986 by ISO?

14         A.     Yes.

15         Q.     Do you know if any of those policies

16   provide for aggregate limits for non-products bodily

17   injury claims?

18         A.     I don't recall.

19         Q.     In the next paragraph, 24, again, your

20   last sentence begins with "It is a long-standing custom

21   and practice in the liability insurance industry...,"

22   could you please read that sentence to yourself?

23         A.     Yes.

24         Q.     Do you agree with me that in the 1960s

25   there were hundreds of different rating bureaus?

Page 44

1          A.     Not that I recall.  There were major
2     rating bureaus.
3          Q.     You testified that there were two?
4          A.     Two major rating bureaus.
5          Q.     Can you describe the marketplace in the
6     1960s and 1970s with respect to rating bureaus?
7          A.     I don't know what the question means.
8          Q.     Can you describe the role of rating
9     bureaus in the 1960s and 1970s?
10         A.     Rating bureaus were under
11    McCarran-Ferguson were allowed to pull together
12    information to develop common forms.  That's what they
13    did.  So the industry was using, generally speaking,
14    common forms.  They had used common forms before 1943,
15    but there was a antitrust case which prohibited that.
16    And then in 1943 or '44 McCarran-Ferguson was enacted
17    which allowed rating bureaus to corporative.  It has
18    the advantage that policy holders buy policies and
19    understand the general terms of the policy.  So when
20    you buy an automobile policy, for example, you don't
21    actually have to read it.
22         Q.     How were the bureaus geographically
23    arranged back in 1960s and 1970s?
24         A.     The major bureaus were countrywide and
25    then there were individual bureaus that were local.

Page 45

1     For example, there was an independent mutual bureau,

2     which was in Chicago.  This is my recollection.

3          Q.    What reference material are you relying

4     upon with respect to that sentence, "It is a

5     long-standing custom and practice in the liability

6     insurance industry for insurance companies to sell

7     primarily CGL insurance using the standardized

8     insurance forms and provisions developed by the rating

9     bureau and later the ISO?"

10                    MR. ZOLA:  Objection to form.

11         A.    Yeah.  I'm not quite sure, if you state

12    it again, I will answer it.  I am not quite sure what

13    you are getting at.

14         Q.    What is your authority or support for

15    that proposition?

16         A.    Let's see.  Years of working with the

17    rating bureaus, ISO in particular.  My historical

18    experience with the AIA, which was a separation from

19    The National Fire Underwriters, one of rating bureaus.

20    The fact that I testified on this issue and had to

21    learn about it from various people.  And I believe it's

22    covered in my underwriter paper in 1979, which I wrote

23    for Congress regulators.  It was used as a training

24    manual.  It's discussed.

25         Q.    What is your support and authority for

Page 46

1    that statement with respect to 1964 to 1973?

2                        MR. ZOLA:  Asked and

3               answered.

4          A.    As I said, I had to testify about that.

5    And so I had to learn about what the conditions were.

6          Q.    When did you testify about that?

7          A.    Oh, you've got my CV somewhere.  But I

8    testified on practically every issue.

9          Q.    I believe your CV is attached to that

10   report?

11         A.    Not this one.  Oh, yes, this is.  It's

12   two-sided reducing the paper.

13               Certainly there was one in 1979 -- oh,

14   I'm sorry, Page 34 of my CV.

15         Q.    I'm talking about prior to 1973.

16         A.    Prior to 1973 -- well, you misunderstood

17   my answer.  I didn't say that I testified prior to

18   1973.  What I said was that I had to testify on behalf

19   of the insurance industry including the history of how

20   the insurance industry operates.  And those items of

21   testimony, some, but not all of which would have

22   included discussions of that sort of issue, are listed

23   on Page 34 and 35.  Although, it's not an inclusive

24   list of my testimony.

25         Q.    Would you agree that today ISO has over

Page 47

1    10,000 different active forms?

2         A.    Well, ISO is completely different now

3    than it was ever since the industry antitrust cases, a

4    totally different company.

5         Q.    Right.  I agree with you.

6               My question is:  Today, you agree with me

7    that ISO has over 10,000 active forms?

8         A.    No, that I don't agree because I don't

9    know.

10        Q.    Okay.  You don't know?

11        A.    No.

12        Q.    Back in 1964 to 1973, do you know how

13   many forms and endorsements various rating bureaus had?

14        A.    Probably quite a few, but I don't know a

15   number.

16        Q.    With respect to this proposition, this

17   Paragraph 24, you are suggesting that there is a

18   standardized policy form and provision?

19        A.    Yes.

20        Q.    What is that form?

21        A.    Well, we have already been talking about

22   it.  But the standard form was the comprehensive

23   general liability insurance policy, which is as I said

24   before was created in 1941, and then could be

25   individually tailored sometimes, but then you would

Page 48

```
 1    have to file as we discussed before, you would have to
 2    file an amendment.
 3           Q.    I'm just trying to understand this
 4    sentence.  So it's your position that a CGL insurer,
 5    such as Agricultural, would have had to use a 1941 form
 6    or a 1955 form or a 1966 form?
 7           A.    It would have used --
 8                 MR. ZOLA:  Objection to form.
 9           A.    It would have used the then-current
10    comprehensive general liability insurance policy.
11           Q.    Was it required to do that?
12           A.    Unless it had filed another form, it
13    would have been required to use that.  And it would not
14    have fit the business model of providing a policyholder
15    with a known quantity.
16           Q.    Between 1964 and 1973, do you know if
17    Agricultural -- or actually strike that.
18                 Prior to 1964 through 1973, do you know
19    if Agricultural had filed another form so that it could
20    deviate from the 1941, 1955 or 1966 forms?
21           A.    No, I do not.
22           Q.    It is possible that Agricultural did
23    that; is that correct?
24           A.    I don't know.
25           Q.    But it's possible Agricultural could have
```

Page 49

1    made a filing with the regulator?

2          A.    It is.

3          Q.    And if Agricultural made such a filing

4    with a regulator, then it would not have had to follow

5    one of these standardized forms?

6          A.    It would not.  However,

7    commercially-speaking it would be very odd to not do

8    so.

9          Q.    Do you know if Agricultural made any such

10   filing?

11         A.    I do not.  And, furthermore, the policies

12   that I have seen look like they are standard CGL

13   policies.

14         Q.    So the policy that the Diocese provided

15   is a most -- Part 2 or Provision 2, is the 1964 to 1973

16   policy?

17         A.    As far as Agricultural that is, as I

18   understand it, the most complete policy.

19         Q.    So that is the 1955 policy?

20         A.    Form?

21         Q.    Yes.

22         A.    I think so.

23         Q.    Twenty-five.  "When companies have

24   losses, they report to ISO."  What do you mean by that?

25         A.    Well, losses -- the rating bureaus create

Page 50

1    rates for an insurance.  So, for example, for product

2    liability there are rates.  If you have a machine tool,

3    and underwriter can look at ISO ratings and will find

4    some industrial code which encompasses, to the best of

5    the underwriter's ability, machine tools.  And that

6    will give a rate.  Now, that rate may be a vague rate.

7    It might be what is called an A rate, which basically

8    is the ISO doesn't have enough information to make a

9    concrete rate.  If, on the other hand, there is a kind

10   of product that has a lot of losses and there is a lot

11   of concrete information about it, then they may find a

12   specific rate.  And the underwriter can use that rate

13   or modify it in various ways.

14        Q.    A company doesn't have to rely on the ISO

15   information, correct?

16              MR. ZOLA:  Objection to form.

17        A.    It is correct that they can develop a

18   rate of their own.  There is -- you know, the problem

19   particularly with general liability is that you don't

20   have enough concrete data.  So, for example, on

21   automobiles, you can --

22        Q.    I don't think we are supposed to talk

23   about automobiles.

24        A.    I was trying to explain rating.

25        Q.    That was a sidebar.

Page 51

1          A.    Notwithstanding your sidebar, I was

2    trying to explain how rating works.  So, for example,

3    State Farm, that's the largest auto insurer, has enough

4    auto data so they can tell whether red cars are more

5    likely to have accidents or not.  With respect to

6    product and commercial liability, there just isn't that

7    kind of information.  So ISO is the best depository for

8    information.  So when an insurance company has losses,

9    it turns it into ISO.  ISO then converts that into --

10   cumulates that and turns it into rates.

11         Q.    Is the red car State Farm example a

12   hypothetical or do you know that?

13         A.    It used to be true.

14             (Off the record.)

15         Q.    So with respect to this Paragraph 25, you

16   are again referring to ISO.  I want to make sure we are

17   clear in terms of the nomenclature we are using here.

18   Because ISO doesn't come in existence until December

19   10, of 1970.  When you are using the term "ISO" here,

20   what are you referring to?

21         A.    When here I am referring to ISO but also

22   the predecessors of ISO operated in the same way.

23   Remember, I worked for AIA, which was a splinter or a

24   breakoff from one of the rating bureaus.  That was

25   required by antitrust action.

1        But, basically, the insurance industry is

2   allowed to coordinate in ways that other industries

3   would not be able to do in order to create common forms

4   and also to develop rates.

5        Q.    So I don't know if you answered my

6   question or not.  With respect to Paragraph 25, are you

7   referring to both ISO and the rating bureaus pre-ISO?

8        A.    Yes.  The operation of the rating

9   bureaus, in general.

10        Q.    Paragraph 26, so you just referenced an

11   A rate.  So if you could not get a rating or a rate

12   from the manual, you could call the insurance company

13   and get an A rate; is that correct?

14        A.    I don't think that's correct.

15        Q.    Okay.

16        A.    What I meant was the insurance company

17   would get a manual from ISO and it might list, for

18   example, turkey poppets.  There are so few turkey

19   poppet cases that they are statically unreliable.  So

20   ISO would put an A.  So when 3M was sued by a woman who

21   swallowed a turkey poppet, that was the only known

22   turkey poppet case.  That is not a basis to form a rate

23   that would be useful.  So, in effect, ISO is saying we

24   don't have a specific rate for turkey poppet, so here's

25   an A, here's what we think it might be or you might

1    want to use a similar industrial code.

2         Q.    Did each company have its own rating

3    manuals?

4         A.    They got their rating manuals from ISO

5    and then they might modify them if they had a

6    particular expertise.  So, for example, Liberty Mutual,

7    had certain -- when I was there, had certain business

8    areas where they got a lot of their own information.

9    So we underwrote federated and allied and almost every

10   department store in the United States.

11        Q.    So everybody didn't ISO.  Each company

12   had its own rating manual?

13        A.    Each company that was a member of ISO had

14   an ISO rating manual, but they were enabled to or

15   entitled to change it, but they had to report.  When

16   they reported their losses, they had to report what

17   they were doing in order to get consistent rates.  You

18   want to make sure the rates would be based on the kind

19   of policy that was issued, whether it had an aggregate

20   or no aggregate.  And then if you were using --

21   different type, using product liability, if you had

22   policies, you had 99.9 percent of policies had an

23   aggregate for product liability.  But if someone was

24   writing a policy without an aggregate for product

25   liability and then started reporting, that information

Page 54

1    would create inaccuracy in the rating.

2          Q.    I appreciate the end of that answer.  But

3    that doesn't mean an insurance company couldn't issue a

4    policy with an aggregate on a non-product bodily injury

5    basis?

6                     MR. ZOLA:  Objection to form.

7          A.    That's correct.  I didn't say that.

8          Q.    So the company could have done that?

9          A.    A company could have, though some would

10   be an odd duck.

11         Q.    And I think, as you said, the insurance

12   company can work with the rating bureaus such that they

13   could deviate from a base rate.

14         A.    Is that a question?

15         Q.    Yeah.  Is that correct?

16         A.    I think they could, but I would be very

17   surprised for various reasons if that would happen.

18   You could if you had enough information.  As I said,

19   Liberty had a lot of information on department stores

20   so you could develop certain rates for that purpose.

21   But, generally speaking, you don't develop your own

22   rate if you are a small underwriter just willy-nilly

23   and your reporting to ISO would have to be different.

24         Q.    Do you know how big of a company

25   Agricultural was?

Page 55

```
1            A.    No.

2            Q.    Do you know how much premium it wrote?

3            A.    Nope.

4            Q.    Do you know if it ever filed a deviation

5      from the rate?

6            A.    I do not.

7            Q.    Are you familiar with the term

8      "discounted rate"?

9            A.    Yes.

10           Q.    What do you understand that to mean?

11           A.    There are all sorts of reasons for

12     discounted rates for what was considered to be a

13     good -- and I don't think it was in this case -- but it

14     had a range of rates for a particular policyholders and

15     the underwriter's judgment was if they were good, then

16     there was a 25 percent discount.  If they were not

17     good, there was a 25 percent surplus -- surcharge.

18           Q.    Discretionary in part?

19           A.    Well, it's discretionary within in a

20     range.  That's basically what you are -- each company

21     has its own actuaries who are setting their own rates

22     and then they send them down to the underwriters.  You

23     have to do certain things no matter what size the

24     company is, you have to allocate your policyholder

25     surplus, you have to figure out how much premium you
```

Page 56

1    can take in and what kind of risk you are going to up

2    rate to.  And that's largely the job of actuaries, not

3    underwriters, but it's obviously an underwriter

4    function.

5         Q.    I'm trying to direct you where in

6    Paragraph 26; I think it's nine lines down, ten.  It's

7    the sentence in the middle that starts with "The

8    original ISO CGL form..."

9         A.    Correct.

10        Q.    What is the original ISO CGL form?

11        A.    It's the form that was in effect at that

12   time.  But, actually, the language comes back to --

13   each of the iterations of the ISO form did not change

14   the entire language of the ISO form.

15        Q.    Right.  But my question is when you use

16   the phrase the original ISO CGL form, which form are

17   you referring to?

18        A.    I think this one may actually have gone

19   back to the '40s, but it certainly would have been in

20   the '55 policy.

21        Q.    And I am not trying to belabor this.  I

22   just want to make sure that I understand.  So the form,

23   are you talking about the '40 form or maybe '41 or are

24   you talking about the '55 form?

25        A.    Actually --

Page 57

1          MR. ZOLA:  Objection to form.

2          THE WITNESS:  Sorry.

3     A.    I think even the '41 form contained the

4  pertinent language limiting -- creating an aggregate

5  for products.  Product liability has almost always had

6  an aggregate.  I have spoken with many people who,

7  other experts that have never seen one with an

8  aggregate, but I have.

9     Q.    Right.  And here with respect to the

10  Diocese of Duluth, they didn't buy products coverage?

11     A.    It appears that's correct.

12     Q.    So to continue with that sentence --

13     A.    It appears it's correct because it's

14  excluded in the policy.

15     Q.    Right.  They didn't buy it in any of the

16  policies that were issued by Agricultural?

17     A.    As far as I know.  Although, the policy

18  has -- the policy in '64 and the policies in '67 had a

19  specific exclusion for products.

20     Q.    That's your understanding of the

21  policies?

22     A.    That's what they had.

23     Q.    Paragraph 27 begins with a discussion of

24  the National Bureau of Casualty Underwriters.  Do you

25  know if Agricultural Insurance Company belonged to the

Page 58

1    National Bureau?

2         A.    I think that is asked and answered.  I

3    don't know which one they belong to, if any.

4                   MS. ADAMS:  You are doing his

5              job.

6                   MR. ZOLA:  I was going to say

7              you are stealing my thunder.

8         Q.    Paragraph 28, Mr. Elliot's article.  He

9    is talking about -- that article is a discussion of the

10   '66 form; is that right?

11        A.    Yes.  But it's also a discussion of

12   history so it includes other parts, as well.

13        Q.    Do you have a copy of this article?

14        A.    I do.

15        Q.    May we have a copy of this article?

16                   MR. ZOLA:  Of course.

17                   MS. ADAMS:  We might even be

18             able to get it during lunch?

19                   MR. ZOLA:  Yeah, I think so.

20             Sure.  Off the record one second.

21             (Off the record.)

22        Q.    Paragraph 29, so after referencing your

23   experience at Liberty and Public Service and AIA, you

24   say it was the general practice that there would be an

25   aggregate limits of products including operations but

1    not other exposures.  And, again, it's the general

2    practice, but it's not the only practice; is that

3    right?

4                        MR. ZOLA:  Objection to form.

5         A.    Well, I said "general practice," by which

6    I meant there might be, although I can recall no

7    example of policies which -- first off, I did see

8    policies; one and maybe two that didn't have an

9    aggregate for products.  I do not recall ever seeing a

10   policy at the time when I was at Liberty or Public

11   Service that had an aggregate applicable to

12   non-products.

13        Q.    You didn't work at Agricultural?

14        A.    I did not work at Agricultural.

15        Q.    And you have no memory of looking at

16   Agricultural forms other than the ones that you've

17   looked at in connection to this matter?

18        A.    Correct.

19        Q.    So you don't know whether Agricultural

20   did or did not issue policies with aggregate limits for

21   non-products bodily injury claims?

22        A.    Well, I don't think they did in the

23   policies we have.

24        Q.    So you continue on to discuss

25   non-products bodily injury cases including claims at

Page 60

1   retail department stores.  Are you talking about slip

2   and falls?

3           A.    No, although, they would also be

4   applicable.  The kinds of cases I was thinking about

5   were ones that were somewhat similar to the archdiocese

6   claims in that they involved personal injury, usually

7   false arrest, libel, slander.  Some of our biggest

8   cases at Liberty were -- and also at Public Service,

9   were false arrest cases --

10          Q.    Under Coverage B, personal and

11  advertising injury?

12          A.    Yes.

13          Q.    Not bodily injury?

14          A.    No.  I think they were bodily injury when

15  personal injury included bodily injury.  We talked

16  about that before.

17          Q.    You haven't looked at any of the abuse

18  claims against the Diocese of Duluth?

19          A.    I have seen abuse claims in other

20  archdioceses -- or other dioceses, excuse me.  I read

21  them.

22          Q.    Is it your understanding these claims are

23  for false arrest?

24          A.    No.  But there is a similarity in the

25  kind of harm that arises.  For example, when I was at

Page 61

1   Liberty Mutual we had a claim against Bloomingdale's by
2   a woman that was arrested, dragged down to
3   Bloomingdale's by the Bloomingdale's force, put into an
4   interrogation room --
5          Q.    And that's similar to being sexual abused
6   by a diocese priest?
7          A.    Yes.  There are the same kinds of
8   emotional harms.  This is actually what I testified to
9   with regard to the reasonableness of claims in the
10  Archdiocese of Boson.  They had the same kind of
11  psychological harm.  This woman, as it happened, had
12  been a detainee or a survivor of a concentration camp.
13  And she was arrested and brought into an interrogation
14  room.  When I was working at Public Service, we had a
15  false arrest where they broke the criminal's neck and
16  killed him.
17         Q.    The claims with respect to UPS, are those
18  auto claims?
19         A.    No.  UPS had the misfortune to have one
20  fellow, there were other claims, but there was one
21  fellow who had three assaults and batteries against
22  him.
23         Q.    Is that what you mean by massive bodily
24  injury, it's a sexual assault claim?
25         A.    I don't follow you.

Page 62

1          Q.    You have the phrase "massive bodily

2     injury exposures."  I am trying to understand what a

3     massive bodily injury exposure would be.

4          A.    Well, you can look at it two ways:  When

5     I looked at the Archdiocese of Boston case, I read

6     every single claim.  To the best of my recollection,

7     there were more than 150.  At the end of that you want

8     to throw up.  The same thing when you watch a person

9     who has been out of a concentration camp being

10    brutalized by an interrogation force at a store.

11         Q.    I am missing what this has to do with

12    UPS.

13         A.    Oh, UPS was one guy beat three people up

14    on three separate occasions.  Those were big awards.

15         Q.    Paragraph 30, the last sentence in your

16    paragraph, you discuss drafting history and

17    contemporaneous commentary.

18         A.    Yeah.

19         Q.    You are referencing drafting history and

20    contemporaneous commentary with respect to the 1966

21    form?

22         A.    Yes.

23         Q.    You are not referencing or suggesting in

24    any way that you reviewed any drafting history with

25    respect to the Agricultural insurance policy forms?

Page 63

1          A.    That's correct.  But only to the extent

2     my opinion is that the Agricultural forms that we have

3     seen are essentially ISO forms.

4          Q.    Right.  It's the 1955 form, correct?

5                    MR. ZOLA:  Objection to form.

6               Mischaracterizes his testimony.

7          A.    I don't recall which particular form.

8     It's an ISO form.

9          Q.    Which form is it?

10                    MR. ZOLA:  For which policy?

11               All of them?

12          Q.    We will start with 1964 to 1967.  Which

13     form is it?

14          A.    To the best of my recollection -- I might

15     be incorrect -- it was the 1955 ISO form.

16          Q.    We want to make sure it's correct.

17          A.    I am giving you my best recollection.

18          Q.    Well, I want to make sure that your

19     recollection doesn't change when we see you next time.

20     So I'm giving you an opportunity to look at the 1964

21     form, 1964 to '67 policy, which is attached to

22     Exhibit No. 3, so you can tell which form it is.

23          A.    By the way, I'd add, that in the

24     pertinent parts of the policy it didn't matter.

25          Q.    Say that last part again.

Page 64

1          A.     The pertinent parts of the coverage

2     didn't change.

3          Q.     I understand.  You said it was one of the

4     forms.  I just want to know which form.

5          A.     I believe that the form is a 1961 form.

6     That is the '64 to '67 form.

7          Q.     So we've talked about a form that was

8     issued in the '40s.  We've talked about a 1955 form and

9     we talked about a 1966 form.

10         A.     Correct.

11         Q.     Which form are you referring to?

12         A.     This one seems to be a 1961 form.

13         Q.     You haven't testified to a 1961 form.

14         A.     That may be correct.  But the content of

15    this form are the same as the 1955 form.  The coverage

16    is --

17         Q.     Can you just explain that to me because I

18    want to make sure I understand what you are saying.

19         A.     The content of this form is the same as

20    the '55 form.

21         Q.     Okay.

22         A.     But it lists as the form number of '61.

23         Q.     I see.  I understand now.

24         A.     But the language, particularly the limits

25    of liability language is language coming from the '55.

Page 65

1          Q.    I understand.  So this is the 1955 form,
2     but it has a date on it of 1961; that's what you are
3     saying.
4          A.    That's correct.
5          Q.    Now, go to the next policy, which is
6     67270.  It's on the back.
7          A.    Is that Exhibit B?
8          Q.    It is.
9          A.    Yes.
10         Q.    Which form applied to the 1967 to 1970
11    policy?
12         A.    It looks as it was the 1966 form.  But,
13    once again, it's my opinion that the language, the
14    crucial language, would have been the same as the
15    predecessor policy.
16         Q.    You agree with me that the endorsements
17    are different between the '64 to '67 policy than the
18    '67 to '70 policy?
19         A.    What endorsement?  I see an endorsement
20    premium.
21         Q.    You are familiar on the decorations page
22    that the forms and endorsements are identified?
23         A.    You mean -- you are talking here about
24    the --
25         Q.    No, I will restate the question.

Page 66

1              On a declarations page the applicable

2      endorsements and forms that make up the policy are

3      listed; is that correct?

4              A.    Sometimes, yes.

5              Q.    Are they listed on the '64 to '67 form?

6              A.    I have to go back.

7              Q.    Well, we can start there.  We can start

8      on this one.

9              A.    On the '67 policy, there are listed one,

10     two, three, four, five, six endorsements.

11             Q.    And are those the same endorsements that

12     are listed on the '64 to '67 policy?

13             A.    Two points on that --

14             Q.    It's a yes-or-no question.

15                        MR. ZOLA:  Let him answer the

16                 question however he wants.

17             Q.    Are they the same?

18             A.    We don't know.

19             Q.    You don't know if those endorsements --

20     well, are the endorsement numbers the same?

21             A.    The numbers are not the same, if that is

22     your question.

23             Q.    That's my question.

24             A.    That doesn't mean -- you asked me

25     actually if the endorsements are the same.

Page 67

1        Q.    That's fine.  You can answer that

2    question, as well.

3        A.    We don't know if the endorsements are the

4    same.  They could be different numbers for the same

5    endorsements.  Not uncommon.

6        Q.    Is it your opinion that they are the

7    same?

8        A.    I think I already answered that.  We

9    don't know if they are the same.  Because all we know

10   is that the numbers are somewhat different although the

11   last is 32637D in '67 and 3267 -- wait a minute,  I'm

12   sorry -- that endorsement is the same.  Oh, I see.

13       Q.    I don't think we did the 1970 to 1973.

14       A.    Not yet.  Did you want me to do those?

15       Q.    I do.  So the question with respect to

16   that is what form was applicable.  I think it's

17   Exhibit C.

18       A.    Yeah, it is.  And there are, once again,

19   three form numbers -- I'm sorry, five form numbers, and

20   I'm sorry but this takes a moment to do.

21       Q.    No, it's okay.

22       A.    Okay.  Form No. 6620 is the same number

23   in the '67 policy.  In the --

24       Q.    Do you know if that endorsement, the

25   terms and conditions of that endorsement?

Page 68

1           A.      No.

2           Q.      Have you ever tried to look for these

3    endorsements?

4           A.      No.   How would I look for them?   They are

5    not attached to this policy.   Let's see here.

6           Q.      Do you have a library of forms?

7           A.      Do I?

8           Q.      Yes.

9           A.      No.

10          Okay.   So that's -- there is a -- the

11   second and third form listed in the '73 policy appear

12   to be repeated in the next policy.   And 19L9 on the 41

13   is the same.

14          Q.      That's the one endorsement we do have,

15   which is the products exclusion.

16          A.      Good.   That's correct.   They do have a

17   products exclusion, which is a specific exclusion of

18   the policies, both of them middle-year policies.

19          Q.      Paragraph 33.   "When an insurance company

20   does something unusual it explicitly notes that it's

21   unusual."   What do you mean by that?

22          A.      Well, I mean, for example, when policies

23   are written on a claims-made basis, it says this is a

24   claims-made policy.   Sometimes it will go further and

25   say this is an important -- this is an important change

Page 69

1    in the policy.  And that's good custom and practice.
2    In the...
3         Q.    How about in the comprehensive general
4    liability context?
5         A.    Well, if you are doing something that the
6    policyholder didn't expect, the expectation of the
7    policyholder was that they would be receiving a
8    standard policy.
9         Q.    What is your basis for your statement?
10        A.    I didn't finish the statement.
11        Q.    Okay.
12        A.    If the policyholder is expecting a
13   certain kind of policy and the policy is different than
14   that expectation, then that is normally listed.  For
15   example, the 1964 to '67 policy is replaced by the 1970
16   policy.  And you can see it's expired and replaced.  In
17   my opinion, if it were going to be different, it would
18   say here new policy or expired in place, but with a
19   different condition so that the policyholder would know
20   that if they previously had, for example, a
21   no-aggregate limit and now we are getting an aggregate
22   limit, that would be a very, very substantial reduction
23   in coverage.  And I would expect to see something here
24   which says this policy is different than the policy it
25   replaces because it is changing the coverage to a

Page 70

1    significant extent in reducing coverage by asserting an

2    aggregate.

3            Q.    Is it your testimony that the custom and

4    the practice in the industry in 1970 was if any term or

5    condition changed upon the renewal of a policy, it had

6    to be identified?

7            A.    That was not my testimony.  My testimony

8    is that if the policy had any significant change than

9    that would that identified.  It would not be called a

10   replacement or a replacement policy.

11           Q.    It's your testimony that the custom and

12   practice in the industry in 1970 was that if there was

13   a, I think you said, substantial or significant change

14   in the coverage, it would be placed on the declarations

15   page?

16           A.    Yes; that is correct.

17           Q.    Is it your testimony that if there was a

18   change from what you are describing as the ISO standard

19   form, that that would also be placed on the

20   declarations page?

21           A.    It would depend on the significance.

22   See, for example, the notice condition said in one year

23   provide notice to such-and-such an address and then in

24   the next year or the next policy it said provide notice

25   to such-and-such different address, I wouldn't expect

Page 71

1    so.  But where there would be a change in coverage

2    which would, in my opinion, necessitate a change in

3    premium then that would be identified.

4         Q.    Unless --

5         A.    In other words --

6         Q.    Go ahead.

7         A.    Just to be clear, when you go from a

8    policy with no aggregate to a policy with an aggregate

9    you are very substantially changing the coverage and

10   you are changing the premium that should be charged and

11   a premium reduction should be reflected, and given that

12   change, it should say so.

13        Q.    And the decorations page should reflect

14   that such an aggregate is going to apply?

15        A.    It normally would, yes.

16              I note, by the way, there is no -- the

17   premium was the same in the first two policies

18   indicating that they were rated and premium assessed in

19   the same format, both premiums being, to the best of my

20   recollection $337 per annum.  So the two policies have

21   the same premium and I assume custom and practice would

22   be that that reflects they have the same risk.

23              MR. ZOLA:  When you say "the

24              first two policies," do you mean

25              Exhibits A and B to the Liberty

1          Mutual answer?

2                    THE WITNESS:  Yes.  I was

3               referring to the '64 to '67 policy

4               and then the '67 to '70 policy.

5               Those are the policies that both

6               have the same premium.

7          Q.    They are also written on an audit basis?

8          A.    But they both list the premium.  Although

9     it's a little hard to tell in the -- at least from the

10    deck page of the '77 policy, that's policy number --

11    oh, I can't even read it.  But the '67 policy, on the

12    deck page, does list limits of liability and then has

13    advanced premium, but it appears to me that it has been

14    cut off on this piece of paper.  That is the extreme

15    right-hand column on the deck page.

16                    MS. ADAMS:  We've gone an

17               hour again.  Can we take a break?

18               (Luncheon recess.)

19          Q.    Could you please go to Page 12 of your

20    report, which you are there.  In Paragraph 33, in the

21    second sentence you state, "In this case, one of the

22    few parts of the insurance policies at issue that have

23    been located are the policies' declarations page and

24    they are standard form."  And for that you are

25    referring to the 1964 to 1967 policy; is that correct?

Page 73

1          A.     Yes.

2          Q.     And that policy is the 1955 specimen

3     form; is that correct?

4          A.     That's correct.

5          Q.     So continuing on with your report, "This

6     means that almost certainly the rest of the policy

7     would be the standard ISO form and would include

8     language limiting aggregate to completed operations and

9     products liability."

10               And you're basing that conclusion on the

11    fact that the '64 to '67 policy is a 1955 form; is that

12    correct?

13         A.     Yeah.  It also has language limiting

14    products, limiting aggregate to products.

15         Q.     Again, on the nomenclature, when you are

16    using words "standard ISO form," ISO was not in

17    existence until 1971, you are referring to the rating

18    bureau specimen forms from 1955 and 1966; is that

19    correct?

20         A.     Right.  And just to be clear, although,

21    there were, as we've discussed, more than one rating

22    bureau, the comprehensive general liability policy was

23    a collaborative effort.

24         Q.     If you could go to Page 14, Paragraph 36.

25               MR. ZOLA:  Nancy, I'm going

Page 74

1              to interrupt just because your

2              questions were limited just to the

3              '64 to '67 policy?

4                   MS. ADAMS:  No.  The first

5              was sentence -- the first was '64 to

6              '67 and that second sentence relates

7              to the others.

8         Q.   On Paragraph 36, just sort of the last

9    sentence, "This language is part of that ISO CGL form."

10   And I will give you a chance to read that paragraph.  I

11   just want to make sure, again, on nomenclature we are

12   talking about the pre-ISO rating bureau forms, 1955 and

13   1966.

14        A.   Could I have the question again?

15        Q.   Sure.  The language "as part of the ISO

16   CGL form," just so we have a clear record, I just want

17   to make sure that your report, in terms of what you are

18   testifying to, is actually clear that you are talking

19   about what is actually pre-ISO forms.

20        A.   Yes, although ISO forms have the same

21   language.

22        Q.   Right.  But the forms we are talking

23   about and have talked about today from the '40s, the

24   '55 and '66, are all pre-ISO forms, correct?

25        A.   Right.

Page 75

1          Q.     If you can go to Page 16?

2          A.     Moving along.  Sixteen, "Conclusions."

3          Q.     If you could read your conclusion.

4          A.     Yes.

5          Q.     This conclusion is based upon the fact

6     that the rating bureaus had standardized forms in '55

7     and '66 and that the 1964 to 1967 policy incorporated

8     the 1955 form; is that correct?

9                      MR. ZOLA:  Objection.

10         A.     In part.

11         Q.     And what are the additional?

12         A.     Well, the additional part is, as I

13    mentioned before, that if you were renewing a policy

14    with a significant deviation from a prior policy, you

15    would say so.  In addition, the fact that you had a

16    very significant reduction in coverage would normally

17    be reflected in a reduction in premium, whereas premium

18    for the two policies we have with premium is exactly

19    the same, $337.  So custom and practice in the

20    insurance industry is if -- it's important to

21    understand that an aggregate is a tremendous limitation

22    on a coverage.  It means that instead of getting

23    X-dollars for just one, using it up, if you have an ton

24    of claims below whatever the attachment or the top is,

25    you are covered for all of them, which may be hundreds

Page 76

1    of claims, in fact, I suppose that's what we are

2    arguing about -- or you guys are arguing about.

3          Q.    Is there --

4          A.    But -- so it's a very significant,

5    significant change in coverage.  And to the extent that

6    there would be such a change, custom and practice would

7    be that there would be a reduction in premium and that

8    there would be a statement that that was current.

9          Q.    Is there anything else that you would

10   like to add with respect to that answer?

11         A.    Yes.  I also do not believe that the --

12   Liberty's contention, the X under comprehensive and

13   general liability, means that there was no product

14   liability included.  And I disagree with that because,

15   in fact, at that time, it was common to just check

16   comprehensive and general liability because it included

17   all of the other coverages.  And that's why these

18   policies have separate exclusions to exude product

19   liability.  If product liability wasn't covered under

20   this X argument, there would be no reason to have an

21   exclusion subsequent in the policy.

22         Q.    Is there anything else you would like to

23   add to that answer?

24         A.    At the moment that's it.

25                MR. ZOLA:  I object to the

Page 77

1                    question to the extent that
2                    everything else he mentioned in the
3                    report including the ten paragraphs
4                    you just skipped are also basis for
5                    his conclusion.
6                         MS. ADAMS:  Understood.
7                    Understood.
8          Q.    Can you give me an example of a policy
9    that you've seen for a comprehensive general liability
10   policy between 1964 and 1973 that identified a
11   deviation in coverage as you have been describing?
12         A.    Can I give you an example?  I can't
13   identify particular policies.  I know I've seen that
14   with AIG several times.
15         Q.    On the claims-made side?
16         A.    No, I'm talking before claims-made.
17         Q.    On the comprehensive general liability?
18         A.    That's correct.
19         Q.    Have --
20         A.    And I think I have also seen it with
21   Travelers, but I cannot identify a particular policy.
22         Q.    And what was the policy provision at
23   issue?
24         A.    Oh, I don't recall.
25         Q.    Have you read Henry Buse's report in this

Page 78

```
1    case?

2              A.    No.

3              Q.    If you go back to your report on Page 16,

4    under references, you identify six documents.

5              A.    Yes.

6              Q.    Are there any other documents that you

7    relied upon with respect to your report other than the

8    six that are identified?

9                    MR. ZOLA:  Objection.

10                    MS. ADAMS:  What is your

11              objection?

12                    MR. ZOLA:  There is also a

13              documents considered section.

14                    MS. ADAMS:  That's fair.  So

15              let me read...

16              Q.    So with the exception of the references

17    listed one through six and the documents considered

18    section, are there any other documents or reference

19    materials that you relied upon in preparing this

20    report?

21              A.    Well, there are some documents that I did

22    not list, but they are a part of my -- they are listed

23    in my CV.  So they would be things that I wrote, things

24    that might come up if I'm asked certain questions, for

25    example, I wrote and referred to before a paper on
```

Page 79

1    product liability insurance.  I wrote three insurance

2    policies, created three companies.  Those are all

3    things that I have done.  I don't highlight them, but

4    they are all in my CV.

5           Q.    What are the three insurance companies

6    that you created?

7           A.    Let me explain.  The first and biggest

8    one was a company called PharmCat, that's P-h-a-r-m-,

9    capital C-a-t.  That was a combined program written by

10   AIG and Commerce ampersign -- ampersand Industry, C&I.

11          Q.    That's an insurance company?

12          A.    Yes.  That was Warren Buffet's.  And that

13   was a policy of $1.1 billion excess of $800,000 million

14   for pharmaceuticals.

15          Q.    And you were the founder of this company?

16          A.    Nothing is ever that simple.  I was a

17   member of a team of five people, including two

18   underwriters or two people from AIG, people from -- and

19   two sets of lawyers and me.

20          Q.    And what was the second insurance company

21   you created?

22          A.    The second insurance company, I don't

23   know if it ever got a name -- oh, no, it did.  The

24   second was NACC, N-A-C-C, Risk Retention Group.

25          Q.    And the third?

1        A.     The third did not get a name.

2        Q.     Did it die?

3        A.     It was a consortium of companies that

4   shared jet A fuel storage facilities.  It was to

5   provide coverage for them.  We wrote the policy, we got

6   agreement from the carriers -- from the potential

7   policyholders.  And it was to cover for environment

8   exposes, but it had a $25 million limit.  We did a

9   survey of one location where cleanup might have been

10  required and we discovered that that would likely be a

11  billion-dollar loss.  So we disbanded it because no one

12  wanted to buy a $25 million coverage.

13       Q.     What was the timeframe of these?

14       A.     The AIG one was in 1996 or '97 and the

15  others were much earlier.  NACC was right after I

16  joined Johnson & Higgins, almost right after.  So that

17  would be '86.  And I did the underwriting and policy

18  forms for all of those.  Just to be clear, we did not

19  decide to underwrite on any of those because the

20  policyholders wouldn't meet our conditions.

21       Q.     Also attached to your report is a copy of

22  your CV, which we've talked about today.

23       A.     We did?

24       Q.     Is this a current version of your CV?

25       A.     I gave possibly a more recent one to

Page 81

1    counsel.

2                        MR. ZOLA:  This is the one as

3              of February 1.

4                        THE WITNESS:  Yeah, I think I

5              wrote one report since February 1.

6         Q.    Other than the one report that you're

7    written, does this CV list all the cases in which you

8    have testified both at trial and at deposition?

9         A.    As an expert, yes.  I've testified in

10   other circumstances.

11        Q.    Does it also identify all of those cases

12   in which you've prepared a report?

13        A.    Yes.  It's not limited to four years

14   either.

15        Q.    I noticed that.

16              So it appears that you have testified a

17   great deal since you retired primarily in two areas or

18   provided expert reports in two areas, one, pollution

19   and the second, asbestos coverage; is that fair to say?

20                        MR. ZOLA:  Objection to form.

21        A.    I would say it's not correct.  I would

22   say that the largest number of cases involved asbestos

23   or environmental usually, and with regard to

24   availability of insurance, but a lot of the cases don't

25   involve asbestos or environmental.

Page 82

1      Q.    I wasn't trying to limit you.  It just
2    looked like there was a lot of environmental background
3    and a lot of work maybe on the pollution exclusion.
4      A.    That's correct.  I have a good
5    background.
6      Q.    From the pollution wars?
7      A.    Form the pollution wars, but also I know
8    the people who wrote the absolute exclusion, to it my
9    wife.  I worked with ISO.
10     Q.    When did she write the absolution
11   exclusion?
12     A.    She was the -- let me clarify that.  Just
13   so you understand, you know how ISO works.
14     Q.    Yes.
15     A.    Okay.  So you have a committee of
16   underwritings and then you have a staff person
17   assigned.  My wife was the staff person.  So when it
18   comes to the final wording, she was the scripter.
19     Q.    When was that, the absolute?
20     A.    The one she was on was '67.  And it's not
21   absolute in any case.  I mean, it didn't include
22   products.
23     Q.    Because there was no such exclusion
24   before then.
25     A.    Well, that's not correct.  Each company

Page 83

1    had its own exclusions.  And the original so-called

2    absolute exclusion was drafted by Dick Schmaltz at

3    Hartford, who formally was at Liberty Mutual.  And

4    Hartford, for example, asked him to draft an exclusion

5    that nothing could get through.

6            Q.    Is any part of your fee related to the

7    Diocese's success in this litigation?

8            A.    No.  The only fees I've ever had that

9    were related to success would have been in consulting

10   matters.

11                   MS. ADAMS:  Do you have the

12              invoice?

13                   MS. McgEE-TUBB:  Yes.

14              (Defendant's Exhibit 4, Invoice from

15              Dennis Connolly dated February 11, 2018,

16              marked for identification.)

17           Q.    I'm giving you what we've marked as

18   Exhibit No. 4.  Do you recognize that document?

19           A.    I do.

20           Q.    What is the document?

21           A.    That's my invoice of February 11, 2018,

22   to Jared Zola and James Murray, and it's for work on

23   the Diocese.

24           Q.    I think consistent with what you had

25   testified to earlier today, on January 7 you had a

Page 84

1    first conversation with Jared Zola.  And then it

2    appears after that that you reviewed documents.  Are

3    those the documents that we've talked about today that

4    are either in the reference or in the documents

5    considered?

6              A.    Yes, that's correct.

7              Q.    Are there any other document?

8              A.    Well, other than my general background,

9    no.

10             Q.    It identifies a drafting meeting.  Who

11   attended that meeting?

12             A.    Jared Zola.

13             Q.    What did you do at that meeting?

14             A.    We talked about the case and we started

15   drafting.

16             Q.    What facts did he tell you about the

17   case?

18             A.    He showed me the policies and he showed

19   me the Liberty answer and explained the contentions.

20             Q.    Did you draft a report together?

21             A.    I told him what to say.  A lot of the

22   report comes from previously-written reports.

23             Q.    You told Jared what to say?

24             A.    Yes.  I don't type so I don't -- I always

25   rely on someone to be the scripter.

Page 85

1      Q.    So Jared -- I should say Attorney Zola
2   typed the report for you?
3      A.    I don't know whether he typed it or
4   whether someone in his office typed it.  But someone at
5   Blank Rome typed it.
6      Q.    Was it an in-person meeting?
7      A.    The meeting I am describing here was
8   in-person.
9      Q.    Other than Attorney Zola, did anyone else
10  review your report that you know of?
11     A.    That I know of, no.
12     Q.    Were there any proposed revisions to your
13  report?
14     A.    I certainly proposed some revisions.
15     Q.    Did Blank Rome or any other attorney
16  propose a revision to your report?
17     A.    Not that I recall.
18     Q.    How many drafts were there of your
19  report?
20     A.    There was one draft and a final.
21     Q.    Where is the draft?
22     A.    It's subsumed in the final.
23     Q.    You don't have a copy of the draft?
24     A.    No.
25     Q.    What brought your attention to the

Page 86

1    Schreiber piece?

2         A.    When I -- my last trial was a matter of

3    Utica Mutual versus...

4         Q.    Fireman's Fund?

5         A.    Yes.

6         Q.    That arose because I was a witness in a

7    case called Goulds, in which the issue of the

8    aggregates for products came up together with the

9    amount of insurance that people might have brought at a

10   particular time.  During the course of research in

11   that, I came across both the Schreiber piece, the

12   Nockman piece and some other pieces.  Then when I was

13   involved in the preparation for the trial of Utica

14   Mutual against Fireman's we also used the same

15   documents.

16              I should mention, by the way, that the

17   Richmond piece appears in the -- and you called it the

18   Schreiber piece --

19        Q.    I called it the Schreiber piece because

20   it's on your bill as that.

21        A.    Right.  The thing about Sol Schreiber is

22   when I was hired at Liberty Mutual, I was hired by

23   Sol Schreiber.

24        Q.    And after reading that, you revised your

25   report?

Page 87

1          A.    A lot of the report comes from

2    previously-written reports.  There was no reason to

3    reinvent the wheel when I have handy language.  I mean,

4    a lot of these issues came up in the Archdiocese of

5    Boston.

6          Q.    Were there any e-mail communications

7    between you and anyone regarding your report?

8          A.    Not that I recall other than transmittal

9    of the final.

10          Q.    Did you prepare for today's deposition?

11          A.    I did.

12          Q.    What did you do to prepare for today's

13    deposition?

14          A.    I read the materials, my report, the

15    documents associated with it, and my CV.  And then on

16    Monday, I met with Jared Zola.

17          Q.    How long did meet with Jared Zola?

18          A.    I think maybe four or five hours.

19          Q.    Four or five hours?

20          A.    Hours.

21          Q.    You did discuss any of the facts of the

22    case during that meeting?

23          A.    Yes.

24          Q.    What facts did you discuss?

25          A.    We talked about the policies, those are

Page 88

1    the facts.  We talked about the fact that the Fireman's

2    CNA policy, which is the other bookend policy that

3    picked up I think in February of '73, had the same

4    provisions as the '64 - '67 policy, the fact that that

5    did include a doctrine right now I am calling bookends,

6    which is a common document used in the -- common

7    doctrine used in these missing policy cases, where if

8    you had one kind of coverage in '64, '67, you sure

9    about that, and then you picked up a new policy in '73,

10   the likelihood would be that those policies are the

11   same.  That is something I testified for Allianz,

12   Great American, Hartford, Utica Mutual.

13            Q.    The Agricultural policy from '64 to '67

14   had the same terms and conditions as the subsequent CNA

15   policy?

16            A.    Yes, basically with regard to the

17   aggregate.

18            Q.    How about with regard to anything else?

19            A.    I didn't look at it with regard to other

20   things.  Although, I did note, if I recall correctly,

21   the premium didn't go up much.

22            Q.    So the CNA policy, is also the '55 form?

23            A.    It's the basic coverage of the CGL.

24                  MS. ADAMS:  I believe I'm

25                  done.  I know Scott has a couple of

1              questions.  So instead of me

2              breaking to go through everything,

3              do you want to pick up and do you

4              want to come down here?

5                     MR. TURNER:  Sure.  I don't

6              know if I said I have a couple

7              questions, but it would be more than

8              two I'm sure.

9                     THE WITNESS:  But you did say

10             half an hour.

11                    MR. TURNER:  But it would be

12             less than half hour.

13     EXAMINATION

14     BY MR. TURNER:

15             Q.   So I know we were introduced earlier and

16     we have spoken since, but my name is Scott Turner and

17     I'm an attorney for the Continental Insurance Company,

18     which is the successor by merger to the Fireman's

19     Insurance Company of Newark, New Jersey.

20                    You were just speaking just now about

21     having reviewed the Fireman's 1973 to 1976 primary

22     policy as part of your bookend analysis.  And I wanted

23     to kind of talk a little bit more about that policy

24     since it's my understanding you reviewed the policy; is

25     that correct?

Page 90

```
 1          A.    I think so, yes.
 2          Q.    I will just mark this as an exhibit here.
 3                     MR. TURNER:  For the record
 4                this is not a complete copy of the
 5                policy.  It's just the CGL part.
 6               (Defendant's Exhibit 5, Excerpt from policy
 7                Bates stamped DD_INS_00234 to DD INS 00244,
 8                marked for identification.)
 9          Q.    If you just take a look at it.
10          A.    Go ahead, Counselor.
11          Q.    And so this Exhibit 5, is this a document
12     that you've seen before?
13          A.    To tell the truth, it doesn't look
14     familiar, but I know I've seen the policy.
15          Q.    Because I believe you've referenced in
16     one of the pages in the report, if you want to look at
17     Exhibit 2.
18                     MR. ZOLA:  Scott, in
19                fairness, I think it was yesterday
20                or the day before when counsel asked
21                what were the Bates ranges of the
22                policy that was shown to
23                Mr. Connolly we gave the entire
24                Bates range, so certainly the first
25                page of Exhibit 5 is not going to
```

Page 91

```
 1              look like the first page that
 2              Mr. Connolly saw because this is an
 3              excerpt.
 4                   MR. TURNER:  Right, it's an
 5              excerpt.
 6                   MR. ZOLA:  It doesn't have a
 7              year on it.
 8                   MR. TURNER:  I appreciate
 9              that.  I didn't want to carry a
10              whole box of documents.  So I
11              apologize.
12         Q.    But if you look at Page 16 of your
13    report, which is Exhibit 2, there is a reference on the
14    top of the page to the limits of liability provisions
15    and then you refer to CNA 1973 to 1976 CGL policy and
16    it has a Bates number there, "DD_INS_00238."  Do you
17    see what I'm referring to?
18         A.    I do.  DD, yes, I do.
19         Q.    And if you look at what I've given you as
20    Exhibit 5, if you refer to DD_INS_00238, you'll see it
21    has that Bates number at the bottom.
22         A.    Yes.
23         Q.    Does that look like that's the document
24    that you were referring to in your report?
25         A.    Yes.
```

Page 92

1          Q.     Okay.   And at the bottom of the page, is

2     that Roman numeral three and it says limits of

3     liability section?

4          A.     Yes.

5          Q.     It sounds like from your report here, on

6     Page 16, that you reviewed this limits of liability

7     section within Exhibit 5.

8          A.     Yes.

9          Q.     And you were referring it with regard to

10    the issue of aggregate limits; is that correct?

11         A.     Well, the policy and that section, yes.

12         Q.     Is this what you would refer to as a

13    standard ISO form?

14         A.     It certainly looks it, yes.

15         Q.     And --

16         A.     I mean, it is generally a standard ISO

17    form.  As we discussed before, there could be some

18    changes, for example, under policy territory, the

19    individual companies do change that to make it

20    worldwide or to limited it to the United States or

21    Canada, but that would not effect the standardized

22    nature of it.

23         Q.     And what about the limits of liability

24    provision here?  When you reviewed it previously you

25    didn't suggest in your report that this deviated?

Page 93

1          A.      That's correct.  It did not.

2          Q.      It looks like it's standard language?

3          A.      Yeah.

4          Q.      Sir, if you could just take a look at the

5     bottom of the page, so that DD_INS_00238, there is this

6     paragraph, "Subject to the above provision respecting

7     'each occurrence,' the total liability of the company

8     for all damages because of (1), all bodily injury

9     included within the completed operations hazard and (2)

10    all bodily injury included within the products hazard

11    shall not exceed the limit of bodily injury liability

12    stated in the declarations as "aggregate."

13             Do you see that section there?

14         A.      Yes.

15         Q.      Is that something you reviewed?

16         A.      Yes.

17         Q.      And so I think from your previous

18    testimony you concluded that to the extent there is an

19    aggregate in this policy, it's for the products and

20    complete operations.

21         A.      That's correct.

22         Q.      And just looking at the paragraph before,

23    just above that, it says, "Coverage A -- The total

24    liability for the company for all damages, including

25    damages for care and loss of services, because of

Page 94

1    bodily injury sustained by one or more persons as the

2    result of one occurrence shall not exceed the limit of

3    bodily injury liability stated in the declarations as

4    applicable to 'each occurrence.'"

5              And do you see that section there?

6         A.   I do.

7         Q.   Is it your understanding that this policy

8    provides an each-occurrence limit?

9         A.   Yes.

10                   MR. ZOLA:  Scott, I'm just

11             going to object to the fact that

12             this excerpt that you provided --

13             disregard, withdrawn.

14        Q.   Well, maybe to clarify, would you like to

15   look at the deck page?

16        A.   I did.

17        Q.   Do you see an each-occurrence limit

18   there --

19        A.   I did.

20        Q.   -- for bodily injury liability?

21        A.   Yes.

22        Q.   For under Coverage A?

23        A.   Yes.

24        Q.   And what is that limit?

25        A.   Coverage A, it's $300,000.

Page 95

1        Q.    And then next to it, it says:  Aggregate

2     dollar sign not covered.

3        A.    Right.

4        Q.    Is that something that you reviewed?

5        A.    Yes.

6        Q.    And then on your report you referenced

7     that this is -- this policy was issued 1973 to 1976, so

8     it's a three-year policy?

9        A.    It's certainly a policy that was intended

10    to be three years and began in -- if I recall

11    correctly.

12       Q.    I don't think we have the dates on that

13    because it's not that kind of a coverage sheet for the

14    entire policy.

15       A.    Right.  All I am getting at is I know,

16    again, in '73, we only had one policy.  It was a

17    three-year policy.  It was canceled after two months.

18    So as far as I know, this was intended to be a

19    three-year policy and was a bookend at the same

20    provisions as the first.

21       Q.    And just to be clear, you didn't look at

22    any of the other policies that Fireman's may have

23    issued?

24       A.    No.

25       Q.    Just this one?

Page 96

1          A.    Just this one.  The one I am familiar
2     with is CNA.
3          Q.    And looking at the next page,
4     DD_INS_00239, do you see there, the second-to-last
5     paragraph in the limits of liability section, it says,
6     "Coverage A and B -- for the purpose of determining the
7     limit of the company's liability, all bodily injury and
8     property damage arising out of continuous repeated
9     exposure to substantially the same general conditions
10    shall be considered as arising out of one occurrence."
11             Did I read that correctly?
12         A.    I think you did.
13         Q.    Is this language that you reviewed
14    before?
15         A.    I have seen this language before.
16         Q.    Would you say thousands of times?
17         A.    Hundreds, maybe thousands.
18         Q.    The next paragraph below that -- I think
19    this is the final time I am going to read a paragraph.
20    "Any limit of the company's liability stated in this
21    endorsement as aggregate shall apply separately to each
22    consecutive annual period comprising the policy
23    period."
24             Did I read that correctly?
25         A.    I think you did.

Page 97

```
1          Q.    Is this language you looked at to prepare
2     your report?
3          A.    Yes.
4          Q.    Have you seen this language before?
5          A.    I am pretty sure I have.
6          Q.    Hundreds of times?
7                    MR. ZOLA:  Scott, I'm going
8                 to object to this line of
9                 questioning.  This is beyond the
10                scope of the direct.  You didn't
11                notice his deposition.  It's beyond
12                the scope of his report.  And you
13                know well that we have a separate
14                expert on this issue that you are
15                trying to get at, so I would save
16                these questions for Mr. Bogart.
17                   MR. TURNER:  So you are going
18                to direct him not to answer?
19                   MR. ZOLA:  Well, There is a
20                question pending, but if you ask
21                more about utilization, which you
22                know this expert is not being
23                proffered for, I am going to direct
24                him not to answer.
25         Q.    All right, well, according to this last
```

Page 98

1   paragraph, this limits of liability section, does it

2   create a separate annual period for the aggregate

3   period?

4               MR. ZOLA:  I am going to

5               direct him not to answer.  He just

6               said he did not rely on it in

7               forming the basis of his opinion as

8               set forth in his report.

9               MR. TURNER:  All right.  If

10              you direct him not to answer, then I

11              won't ask any more questions.

12              I will turn the floor back

13              over to Nancy.

14              See, that was much less than

15              half an hour.

16              THE WITNESS:  Well, you get

17              to come back and have another 28

18              minutes.

19  BY MS. ADAMS:

20      Q.    Towards the end of your discussion, our

21  questions, you referenced an expert report that you had

22  prepared in the Utica Fireman's Fund matter.

23      A.    Yes.

24              MS. ADAMS:  We would like to

25              request a copy of that.

1              MR. ZOLA:  We will certainly

2         take that under advisement.

3              MS. ADAMS:  We are requesting

4         it because he relied upon it and

5         that's where he had learned about

6         the Schreiber information he and

7         given his testimony regarding it, we

8         would like it.

9              MR. ZOLA:  I have no idea if

10        it's under order, confidentiality

11        order, but we will take it under

12        advisement.

13              THE WITNESS:  Also I think I

14        learned about the Schreiber's

15        case -- document in the Goulds case,

16        which is before that.

17              MS. ADAMS:  Well, the record

18        speaks for itself.  I thought you

19        had discussed the Utica Fireman's

20        Fund testimony.

21              That's all we have.

22              MR. ZOLA:  I just want to

23        clarify.  May I ask a question?

24              MS. ADAMS:  See what happens.

25    EXAMINATION

Page 100

1    BY MR. ZOLA:

2        Q.    Mr. Connolly, I would like to direct your

3    attention to your expert report that was been marked as

4    Exhibit 2 and specific Paragraph 33, which appears on

5    Page 12 of that report.

6        A.    Yes, I found the section.

7        Q.    In the second sentence of Paragraph 33,

8    which reads, "In this case, one of the few parts of the

9    insurance policies at issue that have been located are

10   the policies' declarations pages and they are standard

11   form."  When you wrote that sentence in Paragraph 33 of

12   your report to which insurance policy or policies were

13   you referring?

14       A.    I think I was referring to both.

15       Q.    I couldn't hear.

16       A.    All of them.

17       Q.    And when you say "all of them," is there

18   any insurance company you have in mind?

19       A.    Well, I was referring to the policies

20   involved in this case and so I was referring in this

21   case to Agricultural.

22                 MR. ZOLA:  I have no further

23            questions.

24                 MS. ADAMS:  I think we are

25            fine.

Page 101

1          (Witness excused.)

2          (Deposition concluded 1:50 p.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 102

1                    C E R T I F I C A T I O N

2

3    STATE OF NEW YORK          )

                                : ss:

4    COUNTY OF NEW YORK         )

5

6                    I, TONIANN ACQUARO, a notary public for

7    and within the State of New York, do hereby certify:

8                    That the witness whose examination is

9    hereinbefore set forth was duly sworn and that such

10   examination is a true record of my shorthand notes.

11                   I further certify that I am not related

12   to any of the parties to this action by blood or by

13   marriage and that I am in no way interested in the

14   outcome of this matter.

15                   IN WITNESS WHEREOF, I have hereunto set

16   my hand this 15th day of March, 2018.

17

18                   *ToniAnn Acquaro*

19                   ToniAnn Acquaro,

                     Professional Court Reporter

20                   and New York State Notary, 01AC6200255

                     My Commission Expires January 26, 2021

21

22

     (The foregoing certification of this transcript does not

23   apply to any reproduction of the same by any means,

     unless under the direct control and/or supervision of

24   the certifying reporter.)

25

ERRATA SHEET

CASE:  DIOCESE OF DULUTH v. LIBERTY MUTUAL, ET AL.
DEPOSITION DATE:  MARCH 15, 2018
DEPONENT:  DENNIS CONNOLLY

| PAGE | LINE(S) | CHANGE | REASON |
|------|---------|--------|--------|
| 2 | 12, 20 | Change counsel's name | Improper counsel listed |
| passim | | Change "Deck" to "dec." | Transcription error |
| 16 | 22 | Delete "Fund" | Transcription error |
| 20 | 24 | Delete "pay less than 3% of what" and insert "pay 3% less than" | Transcription error |
| 32 | 13 | Delete "up" and insert "favorable" | Clarification |
| 33 | 7 | Delete "policy over" and insert "policyholder" | Transcription error |
| 37 | 20 | Delete "current" and insert "occurrence" | Transcription error |
| 45 | 23 | Insert "and" between "Congress" and "regulators" | Transcription error |
| 52 | 19 | Delete "statically" and insert "statistically" | Transcription error |
| 57 | 7 | Delete "one with" and insert "a products liability policy without" | Clarification |
| 70 | 8 | Delete "than" and insert "then" | Transcription error |
| 82 | 7 | Delete "form" and insert "from" | Transcription error |
| 82 | 16 | Delete "underwritings" and insert "underwriters" | Transcription error |
| 82 | 18 | Delete "scripter" and insert "scrivener" | Transcription error |
| 84 | 25 | Delete "scripter" and insert "scrivener" | Transcription error |

DENNIS CONNOLLY

1    CERTIFICATE OF DEPONENT

2

3        I have read the foregoing transcript of

4    my deposition and except for any corrections or

5    changes noted on the errata sheet, I hereby

6    subscribe to the transcript as an accurate record

7    of the statements made by me.

8



9

10   _____

11   Dennis R. Connolly

12        SUBSCRIBED AND SWORN before and to me

13   this 06ᵗʰ day of _____April_____, 20 18.

14

15

16   _____

17

18                          NOTARY PUBLIC

IVAN BALEV
Commission # 2273810
Notary Public, State of New Jersey
My Commission Expires
April 03, 2021

19

20   My Commission expires:

IVAN BALEV
Commission # 2273810
Notary Public, State of New Jersey
My Commission Expires
April 03, 2021

21

22

23

24

Page 1